John and Rita Dalessio, The Dalessio Family (2003) Trust
16 Via Las Encinas. Carmel Valley, CA 93924:  Tel. No. 831-659-7046
In Pro Per

FILED

MAY 1 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMONWEALTH ANNUITY AND LIFE INSURANCE COMPANY f/k/a/ ALLMERICA FINANCIAL LIFE INSURANCE AND ANNUITY a Delaware corporation, | NO. CV 08 1739<br><br>(Contract) |
| Plaintiff, | ANSWER TO |
| v. | COMPLAINT AND |
| JOHN DALESSIO: RITA DALESSIO and the DALESSIO FAMILY (2003) TRUST | COUNTERCLAIM |
| Defendants. | JURY DEMANDED |
| JOHN DALESSIO: RITA DALESSIO and the DALESSIO FAMILY (2003) TRUST | |
| Counterclaimants, | |
| v. | |
| COMMONWEALTH ANNUITY AND LIFE INSURANCE COMPANY f/k/a/ ALLMERICA FINANCIAL LIFE INSURANCE AND | |

ANSWER TO COMPLAINT                    THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM  Case No.  CV 08-1739        -1-

1
2      ANNUITY COMPANY a Delaware
3      corporation, and DAVID SHANE, an
4      individual, and VAUGHN R. WALKER, an
5      individual, and ANN SPARKMAN, an
6      individual and Does 1 through 20.
7
8                    Counterdefendants.                )
9      _____)
10            As and for its Answer to the Complaint on file herein, Defendants John DALESSIO,
11     Rita DALESSIO and the DALESSIO Family (2003) Trust (hereinafter,
12
13
14        As and for its Answer to the Complaint on file herein, Defendants John DALESSIO, Rita
15     DALESSIO and the DALESSIO Family (2003) Trust (hereinafter collectively,
16
17     "DALESSIO") admit, deny and allege as follows:
18
19            FIRST DEFENSE
20            1.    DALESSIO is without knowledge and information and therefore denies the
21
22     allegations of Paragraph 1 of the Complaint. Henceforth, a denial on that basis shall be
23
24     described as a "denial for lack of information or belief."
25            2.    DALESSIO admits that JOHN DALESSIO and RITA DALESSIO are husband
26
27     and wife and denies the truth of the other allegations of Paragraph 2 of the Complaint.
28            3.    DALESSIO admits the allegations of Paragraph 3 of the Complaint.
29
30            4.    DALESSIO admits that Plaintiff's venue is predicated on 28 U.S.C. Section
31
32     1391(a) and (c). Except as expressly admitted, DALESSIO denies the allegations of
33     Paragraph 4 of the Complaint.
34

ANSWER TO COMPLAINT                           THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM Case No. CV 08-1739          -2-

5. DALESSIO denies for lack of information and belief the allegations of Paragraph 5 of the Complaint.

6. JOHN DALESSIO admits the allegations of Paragraph 6 of the Complaint. RITA DALESSIO and THE DALESSIO FAMILY (2003) (DFT 03) deny for lack of information and belief the allegations of Paragraph 6 of the Complaint.

7. Answering Paragraph 7 of the Complaint, DALESSIO admits that in June, 2006, a verdict was entered in the above referenced action against JOHN DALESSIO. RITA DALESSIO and the DFT 03  this allegation, as they were neither parties to this action nor to the settlement agreement. In July, this verdict was subject to a Motion for New Trial, Motion to Amend Clerk's Judgment, Motion to Stay Clerk's Judgment, Motion for Relief under FRCP Rule 60 and Motion for Relief under Rule 50(b) all filed on behalf of JOHN DALESSIO. The Court never ruled on any of these Motions.

8. Answering Paragraph 8 of the Complaint, DALESSIO admits that in May, 2006, a judgment was entered in the above referenced action against JOHN DALESSIO. In July, this verdict was subject to a Motion for New Trial, Motion to Amend Clerk's Judgment, Motion to Stay Clerk's Judgment, Motion for Relief under FRCP Rule 60 and Motion for Relief under Rule 50(b) all filed on behalf of JOHN DALESSIO. The Court never ruled on any of these Motions.

9. Answering Paragraph 9 of the Complaint, JOHN DALESSIO admits that he entered into a settlement agreement with ALLMERICA Financial Life Insurance and Annuity Company (ALLMERICA). RITA DALESSIO and the DFT 03  deny this allegation, as they were neither parties to this action nor to the settlement agreement.   The settlement

agreement provided that JOHN DALESSIO denied any liability in connection with any

claim, and entered into the settlement agreement solely to avoid litigation and buy peace. To

satisfy the terms and conditions of Section 6: Nature of Settlement, ALLMERICA was

required to dismiss its cause of action against John DALESSIO. ALLMERICA did not fulfill

this requirement.

10.   JOHN DALESSIO admits the allegations of Paragraph 10 of the Complaint.

RITA DALESSIO and the DFT 03 deny this allegation, as they were neither parties to this

action nor to the settlement agreement.

11.   Answering Paragraph 11 of the Complaint, JOHN DALESSIO admits that the

settlement provided for the payments as stated, but alleges that said payments were

contingent upon ALLMERICA dismissing its complaint for fraud against JOHN

DALESSIO. ALLMERICA never dismissed its complaint, which has remained since June,

2006 as the only negative entry against JOHN DALESSIO'S seventy year reputation for

honesty and truthfulness. RITA DALESSIO and the DFT 03  deny this allegation, as they

were neither parties to this action nor to the settlement agreement.

12.   Answering Paragraph 12 of the Complaint, JOHN DALESSIO admits that the

Settlement Agreement provided that failure to pay the sums agreed upon would subject

JOHN DALESSIO to certain penalties and attorney fees, but alleges that said payments were

contingent upon ALLMERICA dismissing its complaint for fraud against JOHN

DALESSIO, and that the penalties in the settlement agreement violated the laws of

California. ALLMERICA never dismissed its complaint, which has remained as a judgment

for fraud against JOHN DALESSIO'S reputation since June, 2006. Except as expressly

ANSWER TO COMPLAINT                           THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM  Case No. CV 08-1739           -4-

admitted or alleged, DALESSIO denies the allegations of Paragraph 12. RITA DALESSIO

and the DFT 03 deny this allegation, as they were neither parties to this action nor to the

settlement agreement.

13.   Answering Paragraph 13 of the Complaint, DALESSIO admits that the

language set forth in paragraph 13 of the Complaint has been copied from the settlement

agreement, but alleges that said payments were contingent upon ALLMERICA dismissing

its complaint for fraud against JOHN DALESSIO. ALLMERICA never dismissed its

complaint, which has remained as a judgment for fraud against JOHN DALESSIO'S

reputation since June, 2006. DALESSIO further alleges that ALLMERICA breached the

terms of the agreement by its failure to perfect its "settle and release" agreement and

expunge its claims against DALESSIO.  Except as expressly admitted or alleged,

DALESSIO denies the allegations of Paragraph 13.

14.   DALESSIO denies the allegations of Paragraph 14 of the Complaint.

SECOND DEFENSE
(no claim stated)
15.   The Complaint, and each count alleged therein, fails to state a claim upon which

relief can be granted.

THIRD DEFENSE
(waiver and release)
16.   In November, 2006, ALLMERICA entered into an agreement with DALESSIO,

releasing all claims by ALLMERICA against JOHN DALESSIO, but DALESSIO alleges

that said payments were contingent upon ALLMERICA dismissing its complaint for fraud

against JOHN DALESSIO. ALLMERICA never dismissed its complaint, which has

remained as a judgment for fraud against JOHN DALESSIO'S reputation since June,

2006.and therefore Plaintiff's Complaint is barred by the doctrines of waiver and release.

FOURTH DEFENSE
(fraudulent inducement)

17.   In entering into initial discussions with DALESSIO, and thereafter, Plaintiff

ALLMERICA failed to disclose that it did not intend to dismiss its complaint against

DALESSIO. This information was not public and was unknown to DALESSIO.  The

information was important information which would have substantially affected the

settlement decisions under consideration by DALESSIO and, in particular, would have

caused DALESSIO to pursue his numerous causes on appeal. ALLMERICA owed a duty to

DALESSIO, to disclose such information, and ALLMERICA'S failure to disclose is a

breach of that duty.  ALLMERICA'S failure to disclose such information also constitutes

fraud in the inducement of the settlement entered into between the parties.  As a

consequence, defendant DALESSIO is excused from any and all performance under

agreements proposed or made between the parties.

FIFTH DEFENSE
(mistake)

18.   Any claim that DALESSIO was obligated to pay damages to ALLMERICA is

barred by the doctrine of mistake, in that DALESSIO and ALLMERICA were mistaken as to

the fact that ALLMERICA was to release its fraud claim against DALESSIO at the time the

alleged settlement was allegedly formed.

SIXTH DEFENSE
(failure of consideration)

19.  ALLMERICA failed to give the required consideration for the settlement

obligations alleged in the Complaint, in that ALLMERICA failed to dismiss, settle and

release its fraud complaint against DALESSIO.  ALLMERICA'S performance was a

material element of the settlement, a condition precedent to DALESSIO'S performance, and

partial consideration for DALESSIO'S performance. Therefore DALESSIO'S performance

on the agreement alleged in the Complaint is excused due to failure of consideration.

### SEVENTH DEFENSE
#### (nonoccurrence of a condition precedent)

20.  DALESSIO incorporates herein the allegations of Paragraph 19 of this Answer.

21.  DALESSIO'S performance on the agreement alleged in the Complaint is

excused due to the nonoccurrence of a condition precedent.

### EIGHTH DEFENSE
#### (material breach)

22.  DALESSIO incorporates herein the allegations of Paragraph 19 of this Answer.

23.  DALESSIO'S performance on the agreement alleged in the Complaint is

excused due to the material breach by ALLMERICA of that agreement.

### NINTH DEFENSE
#### (statute of limitations)

24.  All claims in the complaint are barred by the applicable statutes of limitation.

### TENTH DEFENSE
#### (setoff)

25.  DALESSIO has claims against ALLMERICA as set forth in the counterclaims

asserted hereinbelow, and the amounts due and owing to DALESSIO for damages on such

counterclaims reduce or eliminate any liability of DALESSIO to ALLMERICA under the

claims asserted in the Complaint, by the doctrine of setoff..

WHEREFORE, defendant DALESSIO prays as set forth hereinbelow.

* * * * *

## COUNTERCLAIM

Counterclaimant DALESSIO alleges and counterclaims as follows:

JURISDICTION AND PARTIES

26. The Court has jurisdiction to receive this counterclaim because these claims are ancillary to the claims alleged in the Complaint. Said counterclaim, however, removes diversity from this action. As no federal question is involved, DALESSIO believes and therefore requests that the case be sent to the State of California Court System in the County of Monterey, where both individual defendants reside and where the DALESSIO FAMILY (2003) TRUST was formed and holds its assets.

27. The amount in controversy in this counterclaim, exclusive of interest and costs, exceeds $75,000.

28. Counterclaimant's JOHN DALESSIO and RITA DALESSIO are individuals residing in Carmel Valley, CA. Counterclaimant DALESSIO FAMILY (2003) TRUST is a trust organized and existing under the laws of California.

29. DALESSIO is informed and believes and thereon alleges (allegation on such basis shall henceforth be referred to as "on information and belief") that Commonwealth Annuity and Life Insurance Company f/k/a ALLMERICA Financial Life Insurance and Annuity Company (ALLMERICA) is a Massachusetts corporation with its principal place of business in Massachusetts.

30.   Counterdefendants David SHANE, ANN SPARKMAN and VAUGHN

R.WALKER are California residents. The residencies of Does I through 20 are unknown at

this time.


COUNT ONE  (Fraudulent Nondisclosure Against ALLMERICA and SHANE)

32.   DALESSIO incorporates the allegations of Paragraphs 26 through 31 above.

33.   In 1986, DALESSIO purchased a disability insurance policy from

ALLMERICA. Ten years later, in January, 1996, ALLMERICA sued DALESSIO, claiming

that statements on an application, not made to ALLMERICA, but allegedly relied upon by it,

did not accurately describe DALESSIO'S health at the time that he made application. The

policy contained a two year incontestability clause.

34.   Ten years later, in 2006, ALLMERICA'S action was tried before a jury, with

Judge Vaughn R. WALKER presiding.

35.   DALESSIO, who had represented himself for the past six years (of the ten years

that JUDGE WALKER took to bring the two party action to trial), then was taking a new

prescription medication, in addition to Fexofenadine Hcl Tabs 180MG, Omeprazole Caps

20MG, Paroxetine Hcl Tabs 20MG, Lipitor Tabs 20MG, Bupropion Hcl Sr Tabs 100MG,

1%Epipen Syringe 0.3MG, Ibuprofen Tabs 800MG, and Albuterol Inhaler 17gm 90MCG,

and was suffering from lethargy, mood swings and mental confusion as a result of the

combined effects of the new and old medication. He asked to delay the trial for a short

period until he could withdraw from the medication, but JUDGE WALKER refused this

request. This was DALESSIO'S first request to delay anything during this ten year pretrial

period.

36.  DALESSIO was forced to retain counsel, which he did on April 20, 2006. Trial commenced 30 days later, giving DALESSIO'S counsel twenty one (21) working days to review the 289 legal documents already on file in the action, meet with DALESSIO and his witnesses, research legal issues, witness lists and other papers, prepare trial briefs, and prepare for trial.

37.  DALESSIO'S counsel requested a reasonable delay of trial in order to familiarize themselves with the case and to prepare for trial, but JUDGE WALKER denied their request. WALKER expressed the belief that the two attorneys could somehow digest the 289 documents on file with the Court; the cases of evidence provided by DALESSIO; research the law; decide on a trial strategy; interview witnesses; read, review and catalogue numerous depositions; prepare witness lists pretrial motions and a trial brief; review submissions from Allmerica and respond to them; and prepare a witness with unique memory and mental confusion problems, which were compounded by multiple prescription drugs; all within twenty-one days.

38.  At the commencement of trial, JUDGE WALKER ordered that no witness could be present during the trial, other than for his or her testimony. This order specifically required that Rita DALESSIO, who was called out by JUDGE WALKER, to agree not to testify in order that she might attend the trial in support of her husband.

39.  ALLMERICA'S only testimony as to alleged damages that it suffered was presented by ALLMERICA'S court-disqualified co-counsel, who was present during the entire trial, but was permitted to testify by JUDGE WALKER. On cross examination, this

ANSWER TO COMPLAINT                          THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM Case No. CV 08-1739          -10-

witness admitted that (now) Counterdefendant SHANE was the sole source of the

information that he presented. JUDGE WALKER allowed the testimony to stand, and form

the basis for a later damage decision.

40.   During the punitive damage phase of the trial, ALLMERICA presented no

admissible evidence concerning DALESSIO'S alleged present wealth. DALESSIO testified

that his sole income was a disability check from the federal government. The court, however,

permitted (now) Counterdefendant SHANE to present evidence of DALESSIO'S past

wealth, and to argue without supporting facts that DALESSIO presently was a wealthy man.

41.   During his charge to the jury, JUDGE WALKER interjected his own opinion

into the proceedings, instructing the jury that, "… DALESSIO has substantial resources."

42.   In July, 2006 the jury's verdict was subject to a Motion for New Trial, Motion

to Amend Clerk's Judgment, Motion to Stay Clerk's Judgment, Motion for Relief under

FRCP Rule 60 and Motion for Relief under Rule 50(b) all filed on behalf of JOHN

DALESSIO.

43.   Rather than wait for JUDGE WALKER'S opinion and/or take the matter to

appeal, DALESSIO chose to settle the case for the approximate amount of the actual

damages claimed by ALLMERICA. He did so with the certainty that the punitive judgment

could not stand, and the express promises from ALLMERICA that the terms and conditions

of the Settlement Agreement would remain confidential, that ALLMERICA acknowledged

that its claims remained denied and contested, that ALLMERICA recognized that

ALLMERICA acknowledged that DALESSIO did not admit to any of the charges brought

against him by ALLMERICA and that ALLMERICA acknowledged that DALESSIO denied

any liability in connection to any claims brought by ALLMERICA. ALLMERICA accepted

these terms and conditions, acknowledged that its claims were contested and that its claim

that it had been defrauded by DALESSIO would forever remain unresolved, and signed the

settlement agreement.

44.   At the time of these discussions between DALESSIO and ALLMERICA and

SHANE, and unknown to DALESSIO, ALLMERICA and SHANE did not intend to, and did

not then or at any time thereafter, abide by ALLMERICA'S express promise that the terms

and conditions of the Settlement Agreement would remain confidential; that it

(ALLMERICA) acknowledged that its claims remained denied and contested; that that it

(ALLMERICA) acknowledged that DALESSIO did not admit to any of the charges brought

against him by ALLMERICA; and that ALLMERICA acknowledged that DALESSIO

denied any liability in connection to any claims brought by ALLMERICA. ALLMERICA

accepted these terms and conditions, acknowledged that its claims were contested and that

its claim that it had been defrauded by DALESSIO remained unresolved. ALLMERICA and

SHANE evidenced their intent to defraud DALESSIO and dishonor ALLMERICA'S

settlement agreement by their failure to dismiss ALLMERICA'S action against DALESSIO.

45.   ALLMERICA'S intent to retain a finding of fraud against DALESSIO was

unknown to DALESSIO, and ALLMERICA and SHANE knew or should have known that

DALESSIO was unaware of this information.  The Secret Information was thus in the

exclusive possession of ALLMERICA and SHANE.  DALESSIO was unaware of the

information at the time ALLMERICA agreed to settle its action against DALESSIO or at any

time until after the negotiations and settlement agreement had been completed.

ALLMERICA and SHANE intentionally concealed this information from DALESSIO in order to obtain DALESSIO'S agreement to settle an action that almost certainly would have been reversed upon appeal. DALESSIO would not have settled the case had he known that ALLMERICA and SHANE did not intend to dismiss ALLMERICA'S action and remove from the records a finding that DALESSIO had defrauded ALLMERICA

46.   The concealed intent of ALLMERICA and SHANE not to dismiss ALLMERICA'S action against DALESSIO was material in that, had it been disclosed to DALESSIO, he (DALESSIO) would not have accepted the settlement agreement, but would have demanded that JUDGE WALKER rule on his post-trial motions, and then have processed his many appeal issues (JUDGE WALKER told DALESSIO'S attorneys that should the case return to the district court, he, JUDGE WALKER, would not handle it) before the appellate court.  ALLMERICA and SHANE'S failure to disclose its intent not to honor the terms of the settlement agreement constitutes fraudulent concealment and nondisclosure of material fact.

47.   Had DALESSIO been aware of ALLMERICA and SHANE'S intent not to honor the terms of the settlement agreement DALESSIO would have taken all necessary steps to clear and preserve his otherwise unblemished seventy year plus reputation. DALESSIO'S reputation and he himself has mentally and physically suffered because of ALLMERICA'S and SHANE'S fraudulent conduct. DALESSIO has thus suffered damages in an amount of at least $250,000.

48.   ALLMERICA'S and SHANE'S actions were malicious, oppressive and

fraudulent; ALLMERICA and SHANE acted in willful and conscious disregard of

DALESSIO'S rights.

WHEREFORE, DALESSIO demands judgment against ALLMERICA and SHANE

as set forth below.

COUNT TWO - (Fraud—Release Agreement Against ALLMERICA and SHANE)

49.   DALESSIO incorporates the allegations of Paragraphs 32 through 48 above.

50.   In order to induce DALESSIO to settle his action against ALLMERICA,

ALLMERICA and SHANE made promises and representations to DALESSIO, including,

inter alia, that they did not intend to sue DALESSIO for any other claims, and that they

intended to abide by the terms and conditions of a settlement agreement by which

ALLMERICA would release all past claims against DALESSIO.  ALLMERICA and

SHANE made these representations and promises with the intent that DALESSIO would

rely on them.

51.   DALESSIO did, in fact, justifiably rely to his detriment on the promises and

representations of ALLMERICA and SHANE.  In reliance on such inducements,

DALESSIO entered into a written agreement entitled SETTLEMENT AGREEMENT AND

GENERAL RELEASE (the "Settlement Agreement") with ALLMERICA during

October/November, 2006 and immediately paid ALLMERICA one hundred and sixty five

thousand dollars ($165,000) pursuant to the terms of that agreement.

52.   The representations by ALLMERICA and SHANE were false and fraudulent in

that ALLMERICA and SHANE did not intend to dismiss ALLMERICA'S case against

DALESSIO, but intended to sue DALESSIO for additional damages and did not intend to perform the promises and obligations set forth in the Settlement Agreement. ALLMERICA (Commonwealth) later violated such promises by, among other things, filing this action against DALESSIO. Had DALESSIO known the true facts, he would not have entered into the Settlement Agreement and would not have paid ALLMERICA one hundred and sixty five thousand ($165,000) dollars. As a proximate result of its reliance, DALESSIO has been damaged in an amount of at least $250,000.

WHEREFORE, DALESSIO demands judgment against ALLMERICA and SHANE as set forth below.

COUNT THREE - (Breach of Contract Against ALLMERICA)

53.  DALESSIO incorporates the allegations of paragraphs 32 through 52, above.

54.  During October/November, 2006 ALLMERICA entered into the Settlement Agreement and covenanted not to sue DALESSIO on the claims released therein. The Release Agreement provides for costs and fees, and for injunctive relief in the event of breach by ALLMERICA.

55.  DALESSIO timely has made performance under the Settlement Agreement on his part to be performed in that he paid ALLMERICA the sum of one hundred and sixty five thousand dollars ($165,000).

56.  ALLMERICA has breached the Settlement Agreement by its failure to dismiss its federal court case against Dalessio, its failure to release him from all claims asserted in that action, and by filing this action and these breaches have directly caused damage to

DALESSIO in an amount to be proved at trial, in addition to costs and attorney fees as set

forth in the Settlement Agreement.

57.  And as a further result of ALLMERICA'S breach DALESSIO is incurring

irreparable harm due to the pendency of ALLMERICA'S claims in breach of the Settlement

Agreement

WHEREFORE, DALESSIO demands judgment against ALLMERICA and SHANE

as set forth below.

COUNT FOUR (fraud Against
ALLMERICA, WALKER, SHANE, SPARKMAN and Does 1 through 20)

58.  DALESSIO incorporates the allegations of Paragraphs 32 through 57 above,

and the statements of fact and allegations contained in Exhibit 1, incorporated in by

reference and attached to this Counterclaim.

59.  Allmerica Financial Corporation, Inc. (hereinafter "Allmerica") was a

corporation organized under the laws of the Delaware, with its principal place of business in

Worcester, Massachusetts. Allmerica was authorized to, and does, conduct business in

California.

60.  Defendant is informed and believes and thereon alleges, that Allmerica

Financial Life Insurance and Annuity Company (hereinafter "Allmerica Life") was a

subsidiary of Allmerica, wholly owned and controlled by its parent corporation.

61.  Allmerica Life was designated by Allmerica as the successor-in-interest to the

disability insurance business carried on by State Mutual Life Assurance Company of

America (hereinafter "State Mutual") and/or SMA Life Assurance Company (hereinafter "SMA") in or about 1995.

62.   Thereafter, Allmerica and Allmerica Life engaged in the joint venture of Life and Health Insurance. In approximately October, 1999, Allmerica sold Allmerica Life's disability insurance business to Great-West Life and Annuity Insurance Co. of Denver (hereinafter Great-West). The various remaining entities are represented in this action as entities that are now known as Commonwealth.

PRELIMINARY ALLEGATIONS - THE ALLMERICA POLICY

63. During March, 1988, Defendant was contacted by a sales representative for State Mutual Life and SMA concerning his (Defendant's) need for disability insurance. Defendant met with State Mutual/SMA representative, Raymond Gong, (hereinafter "Gong") on or about March 30, 1988. and agreed to purchase a disability income insurance policy (hereinafter "the Policy") from State Mutual. Prior to meeting in March, 1988, Defendant and Gong had not known each other, and had never conducted business with each other.

64. At the time that Dalessio applied for the Policy, State Mutual/SMA, through its agent, Gong, represented to Dalessio that if he became disabled, as defined in the Policy, it (State Mutual/SMA) would pay Dalessio a monthly indemnity, beginning at $3000 per month, and adjusted annually thereafter pursuant to guidelines set forth in the Policy's Additional Insurance and Cost of Living Adjustment Riders. As set forth in detail below, State Mutual/SMA's promise was false.

65. At the time that Dalessio applied for the Policy, State Mutual/SMA, through its agent, Gong, told Dalessio that it (State Mutual/SMA) would obtain his (Dalessio's) medical

file from his physician, for use in making its (State Mutual/SMA's) underwriting decision.
Gong had been trained by a State Mutual/SMA Sales Manager Steven Branstettor, who had
taught Gong that it was standard procedure for State Mutual/SMA to obtain a copy of the
attending physician's medical file. On or about March 31, 1988, Dalessio signed a blanket
authorization that allowed State Mutual and SMA to obtain, from any source, all of his
medical and financial records.

66. On or about April 12, 1988, APPS, acting as agent for State Mutual sent a
medical examiner to conduct an examination of Dalessio. During the course of this
interview, Dalessio told State Mutual, through its agents APPS and Semeieh, that his
physician was Maurice Cornfield, 9735 Wilshire Boulevard, Beverly Hills, California.
Dalessio also told State Mutual, through its agents APPS that he had suffered from
depression, and that a psychiatrist had proscribed and Dalessio had taken anti-depressant
medication for this condition. Dalessio also told State Mutual, through its agents APPS that
he received disability payments from the federal government.

67. State Mutual, through its agents APPS led Dalessio to believe that it was not
concerned with his depression. State Mutual confirmed this fact when, through its agents,
APPS did not include on its Application, Part II, information provided by Dalessio
concerning his depression. State Mutual's representation was false. As set forth in detail
below, State Mutual did not intend to and did not issue a policy to Dalessio. Its sister
company, SMS, however did issue a policy, using information compiled by State Mutual.

68. During April, 1988, State Mutual, through its Medical Director M. F. Bures,
M.D., wrote to Dr. Cornfield, as follows: "Dear Doctor: Your patient is applying for

insurance. Applicants often are unable to furnish adequate details of their medical history. Please give me the benefit of your experience. A signed authorization is attached… PLEASE INCLUDE ALL CONSULTATIONS, REASONS FOR AND RESULTS OF ALL SPECIAL STUDIES." (Capitalization in original document

69. On or about May 4, 1988, State Mutual, through its employee and Chief Medical Examiner Peter Swenson, received Dr. Cornfield's reply, in which he stated that Dalessio's four annual physical examinations had had revealed no medical problems, and that he had neither treated nor operated on Dalessio. State Mutual, through Swenson and employee S. Bray, also received from Dr. Cornfield a copy of Dalessio's medical file. Said file included the information that Dalessio had suffered from depression, and noted the name of a psychiatrist, Allan Philips, M.D., who had had referred Dalessio to Dr. Cornfield, and who had treated Dalessio for his memory loss. Included in Dr. Philips' medical file were reports on Dalessio's condition submitted by Dr. Philips to the Office of Worker's Compensation Programs (hereinafter OWCP), from whom Dalessio was receiving compensation for a partial disability.

70. State Mutual, through its agent Gong, also requested that Dalessio answer questions concerning his finances. Dalessio and/or his accountant, Stephen Forbat, provided approximate answers (to the nearest $50,000) to questions asked by SMA, through its agent Gong, who partially completed a State Mutual Confidential Financial Statement. State Mutual/SMA, through its agent Gong and employee Swenson, accepted Dalessio's and/or Forbat's responses without comment and without inquiring as to the source of Dalessio's income.

71.    Dalessio intended to purchase a policy from State Mutual. After completing the application process, however, on or about June 15, 1988, Dalessio received from John Quinlan, President of SMA, and Sheila St. Hilaire, Secretary of SMA, Insurance Disability Policy No. S 594,333, from SMA, not State Mutual. Dalessio was unaware that he had been insured by SMA, a stock corporation, rather than State Mutual, a mutual insurer, until July, 2001, when the separate corporate entities were clarified somewhat by a former Allmerica employee.

72. From the date of the Policy, March 31, 1988, to and beyond March 31, 1990, Dalessio was regularly at work. During this two year period Dalessio's income from the practice of law exceeded that of the previous year, and his net worth from his investments increased in excess of one million dollars.

73. At all times herein relevant, and in accordance with the terms and conditions of Policy No. S 594,333, Dalessio fully performed thereunder, including, without limitation, making full and complete annual premium payments.

74. JUDGE WALKER'S participation in the scheme was revealed most clearly by his consistent false representation of determinative facts. JUDGE WALKER knew that these facts were not true, but he continued to repeat them, even when challenged to produce their source. Many of JUDGE WALKER'S findings also were not supported by admissible evidence, and/or his findings ignored sufficient counter evidence that raised fact questions a jury, but could not be submitted to a jury because of JUDGE WALKER'S fraudulent findings and decisions that conflicted with established California law.

75. One element of the scheme was to provide applicants for State Mutual Life disability policies with policies written by SMA, a for profit corporation. In his order of June 28, 2002 [Court document No. 229], granting ALLMERICA'S Motion for Summary Judgment, and denying DALESSIO'S Motions for Summary Judgment, JUDGE WALKER, fraudulently misrepresented that, "DALESSIO admits that he misrepresented his health on his insurance application (to ALLMERICA)." JUDGE WALKER provided no citation for and did not cite evidence to support his false claim, which conclusively determined the outcome of that case in ALLMERICA'S favor. The facts are and were that DALESSIO did not misrepresent his health to ALLMERICA on its insurance application, and he certainly never admitted to doing so.

76. Under California law, ALLMERICA failed to produce admissible evidence to show that   DALESSIO made any representations concerning his health to it.  DALESSIO also presented substantial documentary evidence, witness testimony, admissions by ALLMERICA and circumstantial evidence to show that he had not misrepresented his health to ALLMERICA. This evidence was not contested. Examples of ALLMERICA'S admissions, that DALESSIO had neither misrepresented his health to ALLMERICA, nor "admitted" to this alleged misrepresentation, were recorded during his deposition:

77. DALESSIO did, however, provide answers to questions concerning his health to State Mutual Life Assurance Company of America (State Mutual Life). The fact that DALESSIO applied for a disability insurance policy from and submitted an Application, Part II to State Mutual Life, not ALLMERICA, is not, and cannot be contested.  This fact was stated on the face of the Application, which had been before the Court for more than eight

years.  This fact repeatedly was admitted by ALLMERICA, through its attorney, SHANE, as

follows:

Q "Do you recall anything about your applying for disability insurance with State

Mutual Life Assurance?"

**    *    *

Q (describing the application)"…It says "Declaration to State Mutual Life Assurance

Company of America," and it mentions Ray Gong, Beverly Hills. That's on the top portion

of it. …"

**    *    *

Q "It's your testimony like (sic) with respect to the State Mutual Life Assurance

application, which is marked as Exhibit G, that you have no personal recollection of any

events or transactions concerning your application for this policy?"

78.  An independent witness, Mrs. Karen Love, was present when DALESSIO was

interviewed by State Mutual Life's medical examiner. Mrs. Love declared, under oath, that

in the spring of 1988, she was in DALESSIO'S outer office and overheard him answering

questions about his health. It is uncontested that the answers that Mrs. Love stated that she

heard DALESSIO give the insurance examiner were true.   In dismissing DALESSIO'S

counterclaim, JUDGE WALKER refused to consider Mrs. Love's testimony on the grounds

that there was no evidence that Mrs. Love had heard DALESSIO'S meeting with a State

Mutual Life medical examiner. WALKER made this determination while ignoring the

following facts:

a. DALESSIO purchased one disability insurance policy in 1988. During the spring of that year, DALESSIO met once, on April 12, 1988, with an insurance health examiner. At 11:00 AM, on that date, a health examiner for State Mutual Life obtained from DALESSIO an authorization to take samples of his blood. DALESSIO'S date book established that Mrs. Karen Love had an appointment with DALESSIO at 11:30 AM on April 12, 1988. At no other time or day during the spring of the year 1988 did DALESSIO have an appointment with anyone concerned with insurance that might have extended into an appointment with Mrs. Love. These facts, which are supported by documentary evidence (a bound date calendar), are sufficient for a jury to conclude that Mrs. Love overheard part of State Mutual Life's medical examination of DALESSIO.

b. Mrs. Love was a nurse, and therefore likely to have recalled a conversation that involved surprising revelations about DALESSIO'S health. She testified that during the spring of 1988, she overheard DALESSIO tell an "insurance man," that he DALESSIO suffered from depression and that DALESSIO received partial disability benefits from the federal government. Mrs. Love heard the "insurance man" tell DALESSIO that the insurance company would obtain his medical records and make its policy decision from those records. These facts are evidence from which a jury could conclude that Mrs. Love heard DALESSIO provide State Mutual Life with accurate information about his medical history.

79. DALESSIO provided State Mutual Life with the name and address of his primary care physician. It is uncontested that: a) DALESSIO had been referred to this physician by his treating psychiatrist. b) The information that ALLMERICA claims was withheld from State Mutual Life was set forth in this psychiatrist's notes, letters and tests. And, c)

DALESSIO had been told by State Mutual Life's insurance agent who sold DALESSIO the policy, as well as State Mutual Life's medical examiner, that State Mutual Life would obtain these records. These undisputed facts establish that DALESSIO had every reason to believe that State Mutual Life would obtain his medical records from his physician and his psychiatrist, and know his medical history. Under California law, these facts also are circumstantial evidence, suitable for review by a jury, that DALESSIO provided State Mutual Life with accurate information about his medical history.

80. In 1987 DALESSIO purchased his first disability insurance policy. Benefits from this policy were twice as large as the SMA policy, but ended at age 65. The SMA policy was a lifetime policy. After obtaining the SMA policy, DALESSIO also purchased a life insurance policy. DALESSIO chose not to purchase a waiver of premium for disability on the life insurance policy. These facts are not disputed. His purchase of a much larger disability policy without lifetime benefits, and a life insurance policy without a disability waiver were not consistent with the actions of one who intended to defraud an insurer, and were circumstantial evidence that DALESSIO did not intend to defraud SMA.

81. During this period, DALESSIO represented his children and himself in three very serious automobile accidents. In two of these accidents his car was totaled. In each accident the other driver admitted that he or she was at fault. DALESSIO did not submit personal injury claims for any of these accidents. These accidents provided ample opportunity for DALESSIO to defraud insurers, if DALESSIO had any inclination to do so. The fact that DALESSIO settled each claim for the insurance company's estimate of damage to the

vehicle is circumstantial evidence that DALESSIO would not file a fraudulent insurance

claim.

82. DALESSIO am an individual who enjoyed a distinguished career,  as an attorney

on Wall Street, with the Federal Government, as Special Counsel to New York Governor,

Nelson Rockefeller, and as a partner in a Century City (Los Angles) law firm. DALESSIO

also served as President of the Greater Los Angles Urban Coalition, and as Country Director

for the United States Peace Corps. DALESSIO also was a leader in Los Angles' volunteer

community. DALESSIO was not likely to suddenly embark on a career of insurance fraud.

83. JUDGE WALKER'S findings, that DALESSIO both committed what amounted

to the felony of insurance fraud against ALLMERICA and that DALESSIO admitted to

doing so, I s a false and malicious statement. Protected by his judicial robes, JUDGE

WALKER tried to pass off his defamatory finding as "judicial analysis."  The fact that he

used this known falsehood as the basis for his Summary Judgment decisions demonstrated

JUDGE WALKER'S participant in the Allmerica's fraudulent scheme. JUDGE WALKER

was unable to cite evidence that supported his false and defamatory allegations, even when

given a second opportunity to do so.

84. JUDGE WALKER falsely claimed and made a judicial finding that DALESSIO

had, "…no long term (sic) memory of events that occurred after 1980." Again, JUDGE

WALKER did not cite evidence in the record to substantiate this false claim. JUDGE

WALKER then used his misrepresentation to rule that DALESSIO could not testify that he

(DALESSIO) was working in 1989.

ANSWER TO COMPLAINT                    THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM  Case No.  CV 08-1739          -25-

85. More than twenty medical experts filed reports concerning DALESSIO'S 1980-1993 illnesses and memory. Not one of these medical experts agreed with JUDGE WALKER'S claim that DALESSIO could remember no events after 1980.

86. DALESSIO testified under oath about memories of events that occurred after 1980. During the first day of his deposition ALLMERICA attorney David SHANE tested his memory, and DALESSIO was able to answer Mr. SHANE'S questions. During the second day of his deposition, Mr. SHANE asked DALESSIO about his memory loss:

Q. When you say you have been told lots of things (about his loss of memory), what things have you been told?

A. I have been told it's caused by depression. I've been told it's caused by brain damage. ... There's sort of an ongoing debate.

Q. What kind of brain damage have you been told?

A. I have been told it's—more than likely I had encephalitis in Fiji and that it affected a certain part of his brain which has to do with one kind of memory.

Q. Who told you that?

A. All sorts of doctors have told me that.  (Emphasis added)

87. At his deposition, DALESSIO recalled the names of his neighbors during the 1980's; he remembered that he had worked as an Ambassador in the 1984 Olympics; he knew that he had bought and sold various properties in the 1980's; and, he recalled that, during the 1980's, he had lost money in a business venture with his accountant/tax advisor, Steve Forbat.

88. DALESSIO so proved the fact that he could recall events during the 1980s, that only a jurist committed to the fraudulent scheme would falsely state that DALESSIO remembered no such events. JUDGE WALKER simply ignored all of this evidence.

89. JUDGE WALKER falsely asserted that, "In his deposition, DALESSIO stated that he

could not remember any transactions without reference to his calendars and other records." DALESSIO never made this statement. He did say: "If you asked me to account for what I've done in the 1990's, I'd have a hard time doing that without referencing records and my calendar." Based upon his false and fraudulent misrepresentation, JUDGE WALKER concluded that, "...DALESSIO has no personal knowledge of the events of 1989." (Italics added).

90. JUDGE WALKER found that the fact that DALESSIO had testified under oath that he was working in 1989, was not admissible. He ignored the fact that DALESSIO produced documentary and witness evidence that during 1989 DALESSIO was working, that he had received a legal fee in excess of $200,000, and that his work on a real estate project produced a substantial profit.

91. JUDGE WALKER'S false and fraudulent statement of fact, and his refusal to consider documentary evidence, followed by his illogical conclusion (1989 obviously did not occur in the 1990's), further evidenced that JUDGE WALKER had conspired with ALLMERICA, SHANE and SPARKMAN to deny DALESSIO his right to have his counterclaim heard by a jury and to produce a per-determined outcome for its action against DALESSIO.

92. Two experts retained by ALLMERICA established that, as of 1993, DALESSIO had

limited memory capacity for certain kinds of memory. They also found that other

centers of his memory remained intact.

93. ALLMERICA produced no admissible evidence that DALESSIO'S memory loss

was sufficient to prevent DALESSIO from testifying in his own defense. JUDGE WALKER,

however, struck DALESSIO'S declaration in support of his own claim based upon his

(WALKER'S) finding that DALESSIO had no memory, and then required him to testify,

shackled by the above noted ruling that he (DALESSIO) had no memory, at trial of

ALLMERICA'S complaint.

94. JUDGE WALKER assumed the role of an expert on the neurology of

DALESSIO'S brain. He found, without supporting evidence, that the extent of

DALESSIO'S memory loss was far greater that did any of the experts that examined

DALESSIO. He determined that his memory loss prevented DALESSIO from testifying,

even as to matters known to DALESSIO from intact memory centers.

95. JUDGE WALKER had seen DALESSIO twice. DALESSIO first appeared before

the Judge on December 29, 2000, pursuant to his Motion to Substitute Attorney. JUDGE

WALKER asked DALESSIO a few perfunctory questions, and then determined that

DALESSIO was competent to represent himself in this action. [145]

96. Having made the determination that Dalessio could remember nothing, even

when confronted with conclusive evidence to the contrary, JUDGE WALKER'S later

decision to find DALESSIO incompetent to testify, without taking the trouble to examine

DALESSIO, could only have been based upon WALKER'S participation in the

ALLMERICA/SHANE/SPARKMAN conspiracy to deprive DALESSIO of his right to a fair

and impartial trial, and to prevent DALESSIO from recovering damages from

ALLMERICA, and to require DALESSIO to pay damages to ALLMERICA.

97. During trial JUDGE WALKER determined that DALESSIO was competent to

testify. Hamstrung between WALKER'S finding that he (DALESSIO) had no memory and

SHANE'S repeated and repetitive questions (permitted by Judge Walker, over objection) to

DALESSIO about his activities in the 1980' and 1990's, drugged into a fog, and represented

by inadequately prepared counsel, DALESSIO was unable to present the facts and issues

presented here.

98. DALESSIO was then confronted by a situation in which, if he testified to what he

believed to be the truth, that he recalled events from the 1980's, he was disregarding the

established finding of JUDGE WALKER and placing himself in jeopardy of sanctions from

the judge. No fair trial could proceed under such conditions, but Walker was not interested

in a fair trial.

99.    Without supporting expert evidence, JUDGE WALKER had no basis upon

which to determine that DALESSIO had no memory. Further, by inserting himself as a

supposedly qualified expert, JUDGE WALKER revealed not only his bias and prejudice,

and his cooperation with the /ALLMERICA/SHANE/SPARKMAN fraudulent conspiracy,

but his ignorance of brain neurology. JUDGE WALKER, for example, appeared not to

know, or pretended not to know, that several different memory centers are present in the

human brain. And that damage to one of these centers would not necessarily cause loss of

function to other memory centers. JUDGE WALKER even forgot (or chose to ignore, or lied about) the common knowledge that memory is flexible. Over time, it inexorably will diminish, and sometimes will improve. Also, memory can be "refreshed" by sensory prods, a concept well known to the judiciary. When presented with scientific articles concerning current memory research, from respected scientific journals, JUDGE WALKER, true to his participation in the scheme ignored them.

100. JUDGE WALKER'S lack of knowledge or his willful misstatements about memory may have caused him to state falsely that DALESSIO provided only three reasons why rescission of the Policy would be improper. JUDGE WALKER omitted his first and the most important reason. DALESSIO knew himself, and he knew the kinds of conduct in which he would and would not have engaged. His memory for this type of knowledge remained intact. Therefore, DALESSIO know that he did not intend to defraud State Mutual Life and he did not deliberately misrepresent his health when he applied for the with State Mutual Life. The fact that DALESSIO retained memory for this type of knowledge was admitted by ALLMERICA, through its own medical expert, Dr. Marion Schulman. She found that his memory for social awareness remained intact. JUDGE WALKER ignored this admitted fact, again demonstrating his bias and prejudice and his commitment to the fraudulent conspiracy.

101. JUDGE WALKER accepted as established fact ALLMERICA'S unsubstantiated claim that "In his application, DALESSIO represented (to SMA/ALLMERICA) that he was in good health." JUDGE WALKER'S only source for this alleged fact was a declaration from an ex-ALLMERICA Vice President, Thomas

Kwasniak (Kwasniak). It is uncontested that, prior to submitting his declaration, Kwasniak testified falsely under oath on multiple occasions concerning ALLMERICA'S records. His testimony was suspect, and his credibility, at a minimum, subject to review by a jury.

102. Kwasniak admitted that he was not present during his 1988 medical examination, (he was not employed by ALLMERICA until eight years after DALESSIO purchased the policy, and there is no evidence in the record that he ever was employed by State Mutual Life, the insurance company to whom DALESSIO submitted the insurance application). Kwasniak also admitted that he never talked to State Mutual Life's medical examiner. Accordingly, Kwasniak had neither personal nor second hand knowledge of what DALESSIO said to State Mutual Life during the medical application process.

103. ALLMERICA'S files were not sufficiently reliable to qualify for the hearsay exception as documents "maintained in the normal course of business." Kwasniak testified that ALLMERICA'S records had been taken apart and, at best, clumsily reassembled after they originally had been compiled. For reasons that ALLMERICA did not divulge, some documents had been taken from the file and not replaced and other documents had been later added to these files by persons not identified by ALLMERICA. Thus, ALLMERICA'S files were not admissible as an accurate record as to their contents in 1988. Accordingly, Kwasniak's claim, that DALESSIO had misrepresented his health to SMA/ALLMERICA, was not supported by admissible documentary evidence, even if such evidence could have been found in those records, which it was not.

104. JUDGE WALKER falsely and incorrectly stated that DALESSIO did not object to evidence from Kwasniak. In fact, DALESSIO did object to ALLMERICA'S

1
2    (Kwasniak's) testimony. [Docket documents Nos. 133, 168] JUDGE WALKER denied these
3
4    objections. He determined, without explanation, that the undisputed fact that. Kwasniak
5    twice had made false statements under oath, did not raise a question for a jury as to
6
7    Kwasniak's credibility. JUDGE WALKER also determined that the fact that Kwasniak had
8    no first hand knowledge of the events at issue, and that he testified from unreliable records,
9
10   was not sufficient to raise questions concerning the relevance of and/or the admissibility of
11   his testimony.
12
13       105. Finding that testimony from an admitted perjurer, who relied upon tainted and
14
15   suspect records was conclusive evidence of a determinative question of fact, is further
16   evidence of JUDGE WALKER'S bias, prejudice and participation in the conspiracy to
17   defraud DALESSIO.
18
19       106. DALESSIO was told by both State Mutual Life's sales agent and its medical
20
21   examiner that State Mutual Life would obtain his medical records from his primary care
22   doctor (Physician). DALESSIO also was told that State Mutual Life would rely on those
23
24   records in making its underwriting decision.  His Physician's records included information
25   concerning his depression, and identified the psychiatrist who had referred DALESSIO to
26
27   the Physician.  His psychiatrist's records contained numerous reports made to the Office of
28   Worker's Compensation Programs (OWCP).  DALESSIO provided State Mutual Life with
29
30   the name and address of his Physician, and signed authorizations that permitted it to obtain
31   from him, or from any source, any and all of his medical records.  Thus, all of his relevant
32   medical records were available to State Mutual Life upon its review of his Physician's
33
34   records. None of these facts were contested.

107. Neither ALLMERICA nor JUDGE WALKER addressed this clear circumstantial evidence that DALESSIO had no reason to misinform State Mutual Life's medical examiner about his health, when two independent witnesses (one ALLMERICA'S insurance salesman) testified that DALESSIO had been told that State Mutual Life would obtain and review his medical records. In his opinion, JUDGE WALKER ignored the fact that his Physician's records identified his psychiatrist, and that his (the psychiatrist's) records led to all of his OWCP medical records.

108. In 1993, ALLMERICA demanded that DALESSIO subject himself to a two day examination by Dr. Marion Schulman. DALESSIO informed Dr. Schulman of his prior illnesses, and informed her that his memory problems dated back to 1980. Dr. Schulman reported these facts in writing to ALLMERICA. ALLMERICA does not contest these facts. The fact that DALESSIO openly discussed the illness that he had contracted while working in the South Pacific for the United States Peace Corps with ALLMERICA'S medical examiner was circumstantial evidence that DALESSIO believed that State Mutual Life had obtained and reviewed his medical records. The fact that ALLMERICA ignored this information is circumstantial evidence that ALLMERICA knew about his prior illnesses before 1993, and did not believe that they were grounds upon which to contest the Policy. As part of the conspiracy to defraud DALESSIO, JUDGE WALKER ignored this evidence.

109. JUDGE WALKER argued that, "DALESSIO now admits that he has been disabled since 1980 ..." By saying "now admits" JUDGE WALKER created the false impression that DALESSIO had changed his testimony during the course of this action. DALESSIO has never denied that he suffered a disabling physical illness in 1980, and that

some aftereffects of this illness were permanent. As noted above, independent testimony confirmed that in 1988 DALESSIO informed State Mutual Life (Love declaration) and in 1993 DALESSIO informed ALLMERICA (Schulman report) of these facts. DALESSIO also provided State Mutual Life with access to all of his medical records. JUDGE WALKER'S statement was, at best, misleading and further evidenced his bias, prejudice, and intent to defraud DALESSIO.

110. As noted, ALLMERICA'S own records conclusively establish that in 1993, DALESSIO discussed his prior memory loss and illnesses with ALLMERICA'S psychotherapist, who reported them to ALLMERICA. Upon receipt of this information, ALLMERICA was under a statutory duty to investigate his claim, and promptly to file an action if it determined that the claim was false. ALLMERICA, however, waited years before it filed its action. This clear evidence of waiver was ignored by JUDGE WALKER.

111. During this period of ALLMERICA'S unexplained delay, DALESSIO disposed of his notes and possibly tapes of his meeting with State Mutual Life's medical examiner. These records conclusively would have proved that DALESSIO was innocent of the charges brought against DALESSIO by ALLMERICA. Accordingly, because ALLMERICA'S delay in bringing its action negatively affected his ability to defend himself, it was estopped to bring its action. Another fact ignored by JUDGE WALKER because of his bias, prejudice and intent to commit fraud.

112. ALLMERICA was required by California law to conduct an impartial investigation that was at least as concerned with proving his claim as it was to disproving it. JUDGE WALKER found that ALLMERICA had satisfied this requirement. ALLMERICA,

however, admitted that SPARKMAN and SHANE made no attempt to interview anyone

with knowledge of the allegations in its action. It offered no evidence that they had in any

other manner attempted to obtain information that could prove his claim.  It also violated

California law when it failed to provide DALESSIO with an opportunity to defend himself

against this charge, prior to having his name disparaged through legal process.

113. ALLMERICA admitted that, had it conducted an impartial investigation, and

had it been told by its medical examiner that DALESSIO had fully revealed all of the facts

that ALLMERICA later claimed that DALESSIO withheld, (i.e. had DALESSIO proved his

claim) it still would have terminated his disability benefits and accused DALESSIO of fraud.

This was prime facie evidence, that ALLMERICA failed to conduct a required impartial

investigation, and that this intentional failure was based upon its predetermined intent to

terminate DALESSIO'S disability benefits, even if it had no lawful grounds upon which to

do so, and that ALLMERICA intended to defraud DALESSIO. ALLMERICA'S admitted

bad faith and its intent to commit fraud was ignored by JUDGE WALKER. Rather, he

refused to allow DALESSIO to bring these admitted facts before a jury, by refusing to grant

DALESSIO Leave to File an Amended Counterclaim. Without just cause or supporting

evidence, JUDGE WALKER protected ALLMERICA from its admitted bad faith and intent

to commit fraud.

114. In his Motion for Reconsideration, DALESSIO presented facts stated above to

JUDGE WALKER. DALESSIO characterized JUDGE WALKER'S flawed findings as

"misstatements." DALESSIO used the nebulous term "misstatement" because of his respect

for the institution of the federal judiciary. By definition a misstatement can be either a

mistake or a misrepresentation. When confronted with his charge that he had made numerous "misstatements," JUDGE WALKER refused even to admit that his misstatements were mistakes. Rather, he classified them as, "… the Court's factual analysis." (Emphasis added)

115. The clear, documented facts that DALESSIO presented were not challenges to JUDGE WALKER'S analysis. They were challenges to his competence, to his credibility and, because of his failure to correct them, to his integrity. JUDGE WALKER'S refusal to correct his "misstatements" is substantial evidence that WALKER'S "misstatements" were in fact deliberate acts of fraud. JUDGE WALKER is a compromised man, who used his judicial position to drag out for ten years a flawed, outdated claim by ALLMERICA, a claim that summarily would have been dismissed by an untainted judge. Few, if any, impartial observers would disagree with this conclusion.

116. JUDGE WALKER'S participation in fraud with ALLMERICA and SHANE is evident in ALLMERICA'S false claims under oath, SHANE'S suppression of evidence, and Walker's refusal to afford DALESSIO fair and liberal discovery, as required by the Federal Rules. In its response to his Request for the Production of Documents, ALLMERICA, through its former Vice President, Kwasniak, misrepresented, under oath (after prodding), that it had produced all relevant documents from ALLMERICA'S files. The documents that SHANE provided omitted any document (there are several) that evidenced that State Mutual Life had contacted DALESSIO'S primary care physician, Dr. Maurice Cornfield, before SMA/ALLMERICA issued a policy to DALESSIO.

117. DALESSIO knew that ALLMERICA and SHANE had withheld key documents, which it was required to produce, because, unbeknownst to ALLMERICA, DALESSIO had obtained copies of these documents from State Mutual Life's former insurance salesman, Raymond Gong. But for his fortuitous contact with Gong, ALLMERICA'S and SHANE'S withholding of these documents would have prevented DALESSIO from ever knowing that State Mutual Life had communicated with and obtained medical information from Dr. Cornfield before it issued the Policy. This evidence was essential to DALESSIO'S defense. These documents showed that State Mutual Life sought and obtained his medical records before a policy was issued to DALESSIO. Therefore, neither State Mutual Life nor ALLMERICA could have reasonably relied upon statements contained in the Application.

When this misrepresentation was exposed, ALLMERICA, through Kwasniak, admitted that State Mutual Life had contacted his Physician during the application process. It next claimed, however, that State Mutual Life had never received any of his Physician's medical files. Again, ALLMERICA'S sworn testimony was false. State Mutual Life had obtained DALESSIO'S Physician's medical files. This fact was proven conclusively when DALESSIO'S then attorney found parts of his Physician's files among ALLMERICA'S records.

118. Established presumptions under both California and Federal law required that ALLMERICA and SHANE explain its prior false answers, before it proffered further evidence related to this perjurious testimony. ALLMERICA and SHANE never offered, nor did JUDGE WALKER ever require any explanation as to why it (ALLMERICA) had testified falsely, under oath, on two occasions. JUDGE WALKER simply accepted

ALLMERICA'S next unsupported representation as to how it came to possess his medical records. Records that ALLMERICA had claimed, under oath, that it had never requested, and had claimed, under oath, that it had never possessed.

119. JUDGE WALKER repeatedly was informed of DALESSIO'S many efforts to have ALLMERICA and SHANE voluntarily comply with Federal Discovery Rules. When asked to enforce these rules, JUDGE WALKER delayed his decision on DALESSIO'S motions for five years, before deciding that the issues were complex and passing DALESSIO'S Motions on to a Magistrate Judge. In this manner, JUDGE WALKER aided and abetted ALLMERICA'S and SHANE'S avoidance of discovery. The documented facts supporting his contention that JUDGE WALKER'S handling of discovery was biased and prejudiced and in furtherance of a plan or scheme to defraud DALESSIO

a. In January, 1996 ALLMERICA served its complaint for fraud and restitution against DALESSIO. In March, 1977, Allmerica finally produced in an incomprehensible pile what it claimed were its complete records. In June, 1977 Counsel for Dalessio twice wrote to ALLMERICA/SHANE detailing the deficiencies in its response to production. The latter letter stated: "ALLMERICA'S 'response' was unprofessional, unethical and insulting. It consisted of nonsense objections, incomplete, inaccurate, and in certain instances blatantly false answers, and document production that conveniently omitted most of the documents that supported Mr. DALESSIO'S claims."

b. In July, 1977, Counsel for Defendant filed a Motion to Compel Discovery. ALLMERICA and SHANE claimed, for the first time, that it withheld discovery because settlement negotiations were ongoing. This claim was false. ALLMERICA had offered to

drop its action if DALESSIO would forgo future compensation payments.

ALLMERICA/SHANE was informed in writing that DALESSIO would not discuss

settlement until ALLMERICA had provided missing answers to his Interrogatories and

Admissions, and had produced all documents not otherwise privileged.

    c. DALESSIO continued to try to get ALLMERICA to answer and verify

interrogatories for two more years, and many tens of thousand of dollars in attorney fees,

after which he submitted the permitted two page letter to the Court asking it to order

ALLMERICA to comply with the discovery rules.

    d. JUDGE WALKER responded to DALESSIO'S unopposed discovery motion by

freezing DALESSIO'S discovery for a period of two years, while permitting SHANE to take

DALESSIO'S deposition on four separate occasions over this period. Walker never ruled on

DALESSIO'S request. When DALESSIO later submitted a request for a decision, JUDGE

WALKER determined that, because of its knowledge of the case, he would decide discovery

issues, rather than refer them to a magistrate. Rather than rule on DALESSIO'S long

outstanding and unopposed discovery request, JUDGE WALKER ordered DALESSIO to

submit a new two page letter outlining ALLMERICA'S discovery omissions. Subsequently,

DALESSIO submitted this letter as ordered. JUDGE WALKER never ruled on his second

letter.

    e.  JUDGE WALKER later admitted that his remedy of freezing his discovery, and

placing the discovery timetable in ALLMERICA'S hands was "drastic." He took this

"drastic" step, and sent this case into an inactive limbo, because, he claimed, that

DALESSIO had been responsible for delaying discovery during the years 1998 and 1999.

JUDGE WALKER'S claim was false, and was known by him to be false.

f. In February 19, 2001: DALESSIO submitted his Fourth Request for an order compelling ALLMERICA to comply with his discovery, and in April, 2001: DALESSIO submitted a formal Motion to Compel Discovery. Because JUDGE WALKER had stated that it was familiar with the discovery issues and that he would decide discovery questions, DALESSIO based this Motion on previously submitted documents. In June, however, JUDGE WALKER reversed his prior decision and referred DALESSIO'S Motion to Compel to Magistrate Judge Edward Chen. DALESSIO suspects that Justice Chen never saw the prior discovery documents upon which his Motion was based. If these documents were not submitted with his Motion, it would have been impossible for Justice Chen to understand the discovery issues involved.

g. DALESSIO had intended to conduct depositions of ALLMERICA witnesses after he had received and reviewed answers to interrogatories and requested documents, so that he could integrate these interrogatory answers and documents into his questions. Now four and one half years into the case, DALESSIO gave up hope of ever receiving meaningful discovery from ALLMERICA/SHANE/WALKER axis, and he (DALESSIO) scheduled depositions of ALLMERICA'S witnesses.

h. During these depositions, DALESSIO learned enough facts to enable him to draw up an Amended Counterclaim. DALESSIO obtained these facts over repeated interruptions and "client conferences" by ALLMERICA'S attorney, SHANE, who, it turned out, did not represent the person deposed. DALESSIO did not protest this abuse to JUDGE WALKER

because DALESSIO believed that WALKER'S participation in the ALLMERICA/SHANE

scheme to defraud was so complete that bringing anything to WALKER'S attention would

be turned against him (DALESSIO).

    i. September 4, 2001: ALLMERICA was ordered by Magistrate Judge Chen to

produce certain documents. It (ALLMERICA) failed timely to produce any of these

documents. It later stated that it would produce some of these documents only after

DALESSIO paid it (ALLMERICA) the sum of $1,000,000. DALESSIO did note

ALLMERICA'S failure to comply with the Court's order, but JUDGE WALKER ignored

this information.

    j. In essence, this case took more than ten years to come to trial, and DALESSIO

never received an order of any kind from JUDGE WALKER that interfered with

ALLMERICA executing its stonewalling discovery technique.

    120. In July 2001, DALESSIO finally obtained his first meaningful discovery since

1997. New information that DALESSIO learned included: ALLMERICA/SHANE knew that

its claim that DALESSIO had been residually disabled  during the contestable period was

false, and was known by ALLMERICA/SHANE to be false when it was made;

ALLMERICA/SHANE knew that it had no information to prove that DALESSIO had been

totally disabled during the contestable period, as it had later claimed; ALLMERICA and

SHANE knew that ALLMERICA'S Application File contained documents that belonged in

the Claims File, and vise versa; and, documents had been added to and removed from

ALLMERICA'S files by persons unidentified by ALLMERICA and for purposes

unexplained by ALLMERICA. In summary, ALLMERICA'S files were in disarray. It could

not prove the content of those files in 1988 from an analysis of the content of those files in 1995, or thereafter.

121. DALESSIO also learned that:

a.    ALLMERICA/SPARKMAN had not conducted an investigation in which it sought evidence to support his claim, as required by California law; ALLMERICA/ SPARKMAN did not conduct an impartial investigation, because it had found an excuse (the pending indictment) to terminate DALESSIO'S benefits;

b.    ALLMERICA, through its attorney Debra Connor, admitted that even if its medical examiner confirmed the testimony of Karen Love (that DALESSIO informed State Mutual Life of his prior illness and his receipt of federal disability benefits), ALLMERICA still would have terminated his compensation payments. Connor's testimony is a direct admission of ALLMERICA'S intent to defraud DALESSIO.

c.    Connor had before her 75 statements limiting ALLMERICA'S authorization to obtain and use information about DALESSIO. She deliberately ignored all 75 written limitations, and fraudulently and unlawfully obtained his confidential OWCP file.

d.    ALLMERICA'S attorneys failed to comply with even the most rudimentary and fundamental duties owed to an insured by an insurer; Their activities constituted an assault against DALESSIO'S privacy, his own and his family's health and financial security, and his very freedom.

e.    ALLMERICA repeatedly had sent investigators to trespass on DALESSIO'S property and to spy on him.

ANSWER TO COMPLAINT                    THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM  Case No.  CV 08-1739        -42-

122. DALESSIO was able to see, for the first time, the pattern of harassment and intimidation that ALLMERICA had engaged in from the time that DALESSIO first filed his claim. The claims for relief in his Crosscomplaint related to the same transaction, issues and occurrences as alleged in his initial Crosscomplaint. Much of the proof of his claim resided in ALLMERICA'S previously incomprehensible files. ALLMERICA and SHANE had been aware of these issues since the very beginning (1996) of this action, and had filed ALLMERICA'S action in bad faith.

JUDGE WALKER'S participation in ALLMERICA/SHANE'S scheme to defraud DALESSIO included WALKER'S refusal to allow DALESSIO to file an amended counterclaim. In September, 2001 DALESSIO submitted a Request for Leave to File an Amended Counterclaim. DALESSIO had continuously worked on this document, without interruption, to the extent that his health permitted, from the time that DALESSIO finished phase one of his depositions of ALLMERICA witnesses. His Counterclaim primarily was based upon ALLMERICA'S and SHANE'S violations of California law, its in-house attorney's admission that ALLMERICA intended to commit fraud, and documents that clearly showed that it (ALLMERICA) had acted in bad faith and invaded DALESSIO'S privacy. The Amended Counterclaim was drafted and submitted as quickly as his health permitted. ALLMERICA submitted no admissible evidence in opposition to his Motion.

123 . DALESSIO filed his counterclaim promptly upon the discovery of this new evidence. The pleadings were still open, as ALLMERICA had never answered his previous Amended Counterclaim. No admissible evidence was before the Court in opposition to his Request. JUDGE WALKER, however, allowed his bias and prejudice and his participation

ANSWER TO COMPLAINT                              THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM  Case No. CV 08-1739          -43-

in ALLMERICA/SHANE'S fraud to overrule both the facts and the law. He refused to let

DALESSIO file an Amended Counterclaim

124. JUDGE WALKER correctly found that that the Central District was the proper

venue for this action. Because of his bias and prejudice, and his participation in the

ALLMERICA/SHANE fraudulent scheme, he refused to transfer the case.

The following facts dictated the requirement transfer this case:

a.    The insurance policy, upon which this action is based, was purchased by

DALESSIO in the Central District of California. No operative facts pertaining to this action

occurred in the Northern District of California.

b.    ALLMERICA'S claim did not arise out of or have any connection with any

business transacted by DALESSIO in the Northern District. In good faith, DALESSIO

denied liability in this case. Discovery was just underway, so that transfer of this case would

have caused no substantial delay.

c.    DALESSIO was domiciled in the Central District from 1970 to 1994.

DALESSIO knew attorneys, researchers, statisticians and other support persons who would

assist DALESSIO in the preparation for and trial of this matter.  Trial of this action in the

Northern District was excessively expensive for DALESSIO and excessively burdensome to

the necessary witnesses, when compared to a trial in the Central District.

d.    DALESSIO expected to call approximately 25 witnesses to his defense of

ALLMERICA'S action and the prosecution of his Counterclaim. Twenty-three of these

witnesses were within the range of legal process of the Central District. All of these

witnesses were beyond the reach of the Northern District. The distances that twenty three

ANSWER TO COMPLAINT                THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM  Case No. CV 08-1739        -44-

witnesses would have to travel to attend trial in the Northern District averaged

approximately 287 miles, as compared to attending trial in the Central District, where the

average distance was approximately 16 miles.

125. DALESSIO informed JUDGE WALKER that justice would be promoted by

transferring this cause to the Central District. Necessary expenditures of time and resulting

burdens to the witnesses, most of whom are gainfully employed, would be far less if the case

in tried in the Central District. Such transfer also would greatly have increased his

opportunity to present witnesses whose testimony was essential to his defense.

126. JUDGE WALKER opined that the proper venue for the case was in the Central

District. He refused, however, to transfer the case to its proper venue, because, he

speculated, ALLMERICA might want to move for a summary judgment. Apparently JUDGE

WALKER considered himself the only judge qualified to rule on such a motion.

127. Ten months passed and ALLMERICA did not move for a summary judgment.

DALESSIO again asked the Court to move the case to its proper venue. DALESSIO pointed

out that ALLMERICA had gained enormous strategic advantage by the Court's delaying the

promised change of venue. His case preparation, including the taking of and representation

at depositions, had been set back by his inability to hire trial counsel and expert witnesses.

Moreover, his health had been negatively impacted, to the extent of multiple

hospitalizations, due, in large part to the stress of managing the case.

128. In his Motion, DALESSIO reviewed, in summary form, reasons why

ALLMERICA could not possibly prevail on a Motion for Summary Judgment.

ALLMERICA opposed DALESSIO'S assertions, but provided no evidence upon which it

might base a summary judgment. DALESSIO contended that, unless it could prove fraud, ALLMERICA'S action was barred by the Statute of Limitations, and by language in the contract. DALESSIO believed, in good faith, that the evidence, all of which previously had been provided to the Court, precluded any possibility that ALLMERICA could sustain a summary judgment based upon fraud.

129. JUDGE WALKER again ignored his request and waited another eight months for ALLMERICA to file its Motion for Summary Judgment. As he had predicted, JUDGE WALKER then ruled in ALLMERICA'S favor. His rulings cited the false facts set forth above, and his refusal to recognize the true, unopposed and/or documented facts set forth below. Realistically, JUDGE WALKER'S "invitation" to ALLMERICA to move for summary judgment, and his granting of that motion based upon "facts' that existed only in JUDGE WALKER'S mind were not the product of an independent, honest jurist.

130. JUDGE WALKER'S rulings were sufficiently outrageous that they must have been the products of a conspiracy to defraud DALESSIO.

131. JUDGE WALKER incorrectly applied California law by finding that California's Statutory Incontestable Clause did not prevent ALLMERICA from reducing or denying DALESSIO'S claim. California Insurance Code, §10350.2 provides that every individual disability policy issued in California is required to contain an Incontestable Clause in a form determined by state law. An insurer issuing an individual disability policy may select between two forms of an incontestable clause. ALLMERICA'S disability income policy contained the following two separately identified paragraphs:

(a)    After this policy has been in force for two years during your lifetime (excluding any period during which you are disabled), we will not be able to contest the statements you made in the application.

(b)    We will not be able to reduce or deny any claim for disability which starts after two years from the date of issue because the disease or physical condition existed before the date of issue. There is one exception. We will be able to reduce or deny the claim if the disease or physical condition is specifically excluded from coverage when the loss occurs."

132. In his opinion, JUDGE WALKER attempted to support ALLMERICA'S shifting claim that the Incontestable Clause somehow had been tolled. His contortionist efforts reveal the length to which he was willing to subvert justice. First, JUDGE WALKER quoted and apparently considered only paragraph (a) Of the incontestable clause, and ignored paragraph (b). This latter paragraph, which is not contingent on paragraph a, contains no tolling clause. It requires that an insurer must specifically excluded a disease or physical condition from coverage before it can deny a claim filed after two years from the date of issue of the policy, because the disease or physical condition existed before the date of issue.

133. DALESSIO'S claim for disability was filed after two years from the date of issue of the policy. No disease or physical condition was specifically excluded from coverage in the policy. Pursuant to paragraph (b) above, ALLMERICA was prohibited from denying his claim because his disease or physical condition existed before the date of issue. JUDGE WALKER chose to ignore this clear resolution of ALLMERICA'S action.

134. JUDGE WALKER also incorrectly applied California law by finding that California's Statutory Incontestable Clause paragraph (a) was tolled by a "residual disability." He incorrectly applied California law when he placed the burden of proof on DALESSIO to prove that the incontestable clause had not been tolled. It is uncontested that Defendant did not make a claim on the policy until the two-year contestable period had elapsed. DALESSIO, therefore, provided prime facie evidence that the policy was incontestable. ALLMERICA asserted that the incontestable clause was tolled. The burden of proof on this issue rested upon ALLMERICA, the party asserting the claim. JUDGE WALKER instead placed the burden on DALESSIO.

135. In 1990, DALESSIO had advised ALLMERICA that the two-year contestable period had run. ALLMERICA did not contest this fact. In 1993, DALESSIO told ALLMERICA'S independent medical examiner that his memory problems, the cause of his original disability dated from 1980, and that it might have been caused by tuberculosis or a brain injury. ALLMERICA took no action after learning these facts. In 1996, ALLMERICA first claimed that contestable period had been tolled. An independent jurist might have considered that ALLMERICA was estopped from claiming that the incontestable clause was tolled. JUDGE WALKER ignored this evidence.

136. The Policy definition of "residual disability" required that a "sickness" cause the insured's loss of earnings." "Sickness" was defined in the Policy as "… sickness or disease which first manifests itself while this rider (the Lifetime Sickness Rider) is in force." Thus, in order for an insured to be "residually disabled" he or she must suffer a "sickness" that first manifests itself during the time that the Policy was in effect. ALLMERICA'S entire

Complaint, however, was based upon its assertion that DALESSIO'S disabling sickness first manifested itself before DALESSIO purchased the Policy. Therefore, DALESSIO could not have been residually disabled, as that term is defined in the Policy, because his illness did not first manifest itself during the contestable period.

137. JUDGE WALKER, however, determined that the policy definition of "sickness" did not apply to the Incontestable Clause. The Court claimed, without citation, that the policy's Lifetime Sickness Rider (LSR) was "in force" only when an insured turned 65. No such limitation appeared in the Policy. Absent express language stating that the LSR was not in force when the policy was issued, no reasonable person would conclude that the LSR was not in force once the policy was issued by the insurer. At best, the language crafted by ALLMERICA created an ambiguity. An impartial jurist would have followed both California and Federal law and held the ambiguity against ALLMERICA. JUDGE WALKER must have determined that the ambiguity was DALESSIO'S fault, even though DALESSIO had no say in the drafting of the contract.

138. JUDGE WALKER again incorrectly applied California law when it found that his base income qualified DALESSIO as "residually disabled," as that term was defined in the policy.

a.    The policy Rider for Residual Disability (RRD) defined "residual disability" to mean, "... that although you are engaged in an occupation, injury or sickness causes you to earn at least 20% less than your base earnings."

b.    Throughout the more than thousand pages of ALLMERICA'S files, there is not one single reference to DALESSIO'S "base earnings," or one single reference to his being

"residually disabled." Presumably, since ALLMERICA knew that DALESSIO suffered from some preexisting disability no later that 1993, when an ALLMERICA doctor reported this fact to it, it would have calculated this figure and noted it in its files.

c.    JUDGE WALKER, however, arrived at the bazaar conclusion that DALESSIO'S base income, as defined in the policy, was the income that he earned in 1980, eight years before he purchased the policy. This "interpretation" could not be sustained under California law, where any ambiguity in policy language is decided against the insurer.

d.    DALESSIO provided conclusive evidence that he had received 1989 payments for legal services of over $220,000 from just two of his clients. His earnings were greater than his entire Peace Corps salary for the period 1978 through 1980. JUDGE WALKER simply ignored these facts and found that DALESSIO'S earnings during the contestable period were less than his yearly1978-1980 Peace Corps earnings.

139. In addition to ignoring his proven 1989 income, JUDGE WALKER determined that DALESSIO'S "income" did not include income from his real estate ventures. The policy contained no such limitation. JUDGE WALKER also determined that the definition of "occupation" contained in the Policy did not include DALESSIO'S pro bono legal services. No such limitations appeared in the Policy. JUDGE WALKER alone created these limitations, acts prohibited by California law.

140. Once JUDGE WALKER determined that DALESSIO had been disabled since 1980, as that term is defined in the policy, he calculated DALESSIO'S base income from a time eight years before DALESSIO purchased the policy. This too clever twisting of the policy's Rider for Residual Disability (RRD) provisions opened a Pandora's Box of troubles.

According to JUDGE WALKER'S interpretation of the policy, DALESSIO'S "index month" would commence at some unidentified date in 1980. Pursuant to the policy after the first year of disability, in DALESSIO'S case sometime in 1981, the definition of "base earnings" would change to "base earnings will mean indexed base earnings." The purpose of "indexed base earnings" was to increase yearly the benefit paid to an insured according to a formula based upon the increase in the Consumer Price Index.

141. The RRD further provides: "If you suffer residual disability, we will pay you a monthly benefit. Benefits will start after the elimination period, or after total disability ends if later." The Elimination Period is defined in the policy as: "…the number of days at the beginning of each period of disability when you do not receive benefits." The elimination period for DALESSIO'S policy was 60 days. According to JUDGE WALKER'S ruling, DALESSIO was entitled to receive residual disability benefits from SMA for the period 60 days after an undetermined date in 1980 until September 1990.

According to JUDGE WALKER'S interpretation of the RRD, SMA'S policy committed it to pay residual disability benefits, increased by a formula based upon the consumer price index times the number of years that an insured claimed that he or she was residually disabled, *before he or she purchased the policy*. No insured believes that an insurer would reach back to a time before a policy was purchased and pay him or her benefits for a pre policy period. And no insurer would do so. As used in the RRD, "the date a disability began" must commence after the policy date of issue.

142. In doing the acts alleged herein, ALLMERICA, SHANE, SPARKMAN and WALKER have acted with malice, oppression and fraud, and with the intent to harm

DALESSIO and/or with willful and wanton disregard for the harm these acts would cause to DALESSIO. Because of this despicable conduct, DALESSIO seeks punitive damages in an amount sufficient to punish ALLMERICA, SHANE and WALKER and to serve as an example to others.


        WHEREFORE, Defendant and Counterclaimant DALESSIO prays for judgment as follows:

        On ALLMERICA'S complaint:

        1.    That Plaintiff CPE take nothing by way of its complaint;

        On Counts One, Two, Three and Four of the Counterclaim

        2.    For actual damages in favor of DALESSIO and against SHANE, SPARKMAN and WALKER jointly and severally, in the amount of $500,000 or according to proof at trial;

        On Count Three of the Counterclaim:

        3.    For actual damages in an amount to be proved at trial, plus all other costs;

        4.    A preliminary and permanent injunction prohibiting ALLMERICA from prosecuting its claims in violation of the Settlement Agreement.

        On Counts One, Two and Four,

        5.    For punitive damages against each of SHANE, SPARKMAN, WALKER and ALLMERICA in an amount sufficient to punish them for their wrongful acts and to serve as an example;

        On all Counts

6.    For interest on all judgment amounts at the legal rate;

7.    For reasonable attorney's fees;

8.    For DALESSIO'S costs of suit;

9.    For such other and further relief as the Court deems proper.

Dated: May 12, 2008


_____

for Defendant and Counterclaimant, JOHN DALESSIO


_____

for THE DALESSIO FAMILY (2003) TRUST


_____

for Defendant and Counterclaimant, RITA DALESSIO

ANSWER TO COMPLAINT                    THE HON. RICHARD W. WIEKING
AND COUNTERCLAIM Case No. CV 08-1739        -53-